**Johnny Raymond POWELL, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 01–91–00325–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 26, 1992.

Rehearing Denied Oct. 1, 1992.

Discretionary Review Refused
Jan. 13, 1993.

---

Paul G. Johnson, Angleton, for appellant.

Jim Mapel, Kelly McClendon, Angleton, for appellee.

Before SAM BASS, MIRABAL and O'CONNOR, JJ.

## OPINION

SAM BASS, Justice.

A jury found the appellant, Johnny Raymond Powell, guilty of aggravated robbery, found at least two enhancement paragraphs numbered 12, 13, 14, and 16 true, and assessed punishment at confinement for life.

We affirm.

On May 28, 1989, at about 10:00 p.m., James and Laura Goodrum, stopped at a convenience store in Pearland to buy some cokes and Twinkies. Mrs. Goodrum went into the store, and Mr. Goodrum stayed in the car. A man walked up to Mr. Goodrum, pulled a gun on him, and told Mr. Goodrum to get out of the car. Mr. Goodrum got out and the man pointed the gun at his stomach. The man told Mr. Goodrum to give him his wallet. Mr. Goodrum gave him a checkbook. The man pushed Mr. Goodrum away, and got into the Goodrums' car to leave. The man was unable to move the car, so he got out and ran away.

Meanwhile, Mrs. Goodrum had paid for the cokes and Twinkies and was preparing to leave the store. She saw a man holding a gun on her husband, and asked the clerk to call 911. The police arrived just a few minutes later.

The Goodrums described the man to the police, and got into the squad car to go to the police station. As they were getting into the car, a radio message was received that the police had apprehended a man a few blocks away. The Goodrums went with the police to that location, and identified the appellant as the man who had robbed them.

In his first point of error, the appellant asserts the trial court erred in failing to suppress the in-court identification testimony because the out-of-court identification procedures were overly suggestive. The appellant complains the "showup" was impermissibly suggestive because: (1) the two witnesses were shown him together; (2) he was handcuffed and on the ground; (3) there was no line-up or photographic spread; (4) a spotlight was shined on his face; and (5) the police told the witnesses they had a suspect.

Before trial, the appellant moved to suppress the identification by Mr. Goodrum because he might have seen a set of photographs of the appellant at the Pearland Police Department and because he was allowed to observe the appellant by himself without a line-up of similar individuals. After a pretrial hearing, the trial court denied the motion. The error raised on appeal comports with the motion because Mr. Goodrum's only observation of the appellant happened when he identified him the night of the robbery near the convenience store. When a pretrial motion to suppress identification is overruled, the defendant need not subsequently object to the admission of the same evidence at trial in order to preserve error. *Livingston v. State*, 739 S.W.2d 311, 334 (Tex.Crim.App. 1987), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). The appellant preserved his complaint about the out-of-court identification procedures.

Courts have long been concerned that the practice of showing suspects singly to crime witnesses in the presence of police officers is suggestive and conducive to mistaken identification. *See Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972–73, 18 L.Ed.2d 1199 (1967); *Jackson v. State*, 682 S.W.2d 692, 695 (Tex.App.—Houston [1st Dist.] 1984, pet. ref'd). At the same time, identification at or near the scene of the offense shortly after its occurrence may be appropriate because the witnesses' memories are still fresh and accurate. Such a procedure also allows the police to release innocent suspects after exoneration

and continue the search while the perpetrator may still be in the area.

█ To determine whether a single showup violates due process, we must examine whether the confrontation was: (1) unnecessarily suggestive; and (2) conducive to the irreparable misidentification of the defendant. *Jackson*, 682 S.W.2d at 695. We look at the totality of the circumstances. *Stovall*, 388 U.S. at 302, 87 S.Ct. at 1972–73. Mr. Goodrum acknowledged that the police told him they had a suspect in custody when they arrived at the location where the appellant was being held. Mr. Goodrum did not remember if the appellant was handcuffed, although the testimony of police officers indicated that he was. Mr. Goodrum made the identification from the back seat of a patrol car. He noted that there were several police officers at the scene and that the police cars had their headlights on. He did not recall if the headlights were pointed at the appellant.

█ While the procedure may have been unnecessarily suggestive, we must also consider whether irreparable misidentification was likely. We are guided by five factors: (1) the witness' opportunity to view the suspect at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the suspect; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the offense and the confrontation. *Jackson*, 682 S.W.2d at 695.

█ Mr. Goodrum estimated that the appellant's gun was "stuck" in his stomach for 15 or 20 seconds, that he was looking at the appellant's face the entire time, and that the appellant was about two feet away from him. However, the elapsed time, from when the appellant approached Mr. Goodrum's car window and finally ran away, was probably a minute to a minute and a half. Mr. Goodrum testified that his corrected vision was 20/20, that he was wearing his glasses the night of the robbery, and that the lighting was very good in front of the convenience store. Mr. Goodrum stated his attention was strictly on the appellant. Mr. Goodrum estimated that his identification of the suspect, a few blocks from the convenience store, took place no more than 10 minutes after the holdup.

Viewing the evidence in light of the *Jackson* factors, the identification procedure did not result in irreparable misidentification.

We overrule the appellant's first point of error.

█ In his fifth point of error, the appellant argues that the trial court erred in failing to file written findings of fact and conclusions of law concerning the admissibility of the in-court identification of the appellant by Mr. Goodrum. The appellant relies on *Sims v. Georgia*, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967).

The appellant filed a pretrial motion to suppress identification because Mr. Goodrum was allowed to observe the appellant near the scene without a line-up and because of impermissibly suggestive pretrial photographic procedures. After a hearing, the appellant's motion was overruled, and on March 18, 1991, the appellant requested findings of fact and conclusions of law from the hearing. The trial court agreed and placed the burden on the State of preparing them. Findings of fact and conclusions of law have not been filed.

In *Sims*, the United States Supreme Court stated that the trial court need not make formal findings of fact or write an opinion, but its conclusion, that the defendant's confession was voluntary, "must appear from the record with unmistakable clarity." 385 U.S. at 544, 87 S.Ct. at 643. The reasoning in *Sims* does not support the appellant's contention that a trial court's findings on the admissibility of an in-court identification must be entered into the record.

The Court of Criminal Appeals has stated that, while the better practice is to enter written findings indicating why *photographic* evidence is admissible and not impermissibly suggestive, the failure to do so is not reversible error. *Williams v. State*, 477 S.W.2d 885, 888–89 (Tex.Crim.App.

1972). As in *Williams,* the trial court here held a hearing and overruled the objection to the admissibility of any in-court identification. The trial court's action in overruling the objection was tantamount to a finding of admissibility as a fact. *Williams,* 477 S.W.2d at 889. In point of error one above, we reviewed the record of that hearing and found the trial court did not err in failing to suppress Mr. Goodrum's in-court identification of the appellant.

We overrule the appellant's fifth point of error.

In his second point of error, the appellant contends that the trial court erred when it failed to quash the jury panel because the State peremptorily struck two black and one Hispanic venire members in violation of U.S. CONST. amends. V and XIV, TEX. CONST. art. I, sec. 19, and TEX.CODE CRIM.P.ANN. art. 35.261 (Vernon 1989). *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), *Powers v. Ohio,* —— U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), and *State v. Oliver,* 808 S.W.2d 492 (Tex.Crim.App.1991).

The appellant is white. Three of the four minority members of the venire were struck by the State. One Hispanic served on the jury. The trial court took judicial notice that 43 out of the 47 members of the venire were white. The jury was selected from among the first 33 members of the venire.

The appellant raised his *Batson* challenge after the jury was sworn. The State did not object. Defense counsel waived the oath and called the prosecutor to testify. The prosecutor stated that he tries to use all of his peremptory challenges except in unusual circumstances. He stated he had a hard time doing so in this case because it was a good jury panel. Once he got past what they knew of the defendant or whether they had a problem with the law, he testified that he went on the basis of general things, such as a person's weight or whether he had a mustache or beard.

The prosecutor stated that he struck two of the minority venire members (Brown, number three, and Carranza, number 26) because they were overweight. He stated that he believed overweight people feel themselves victimized and can be sympathetic to the accused in a criminal case. He agreed that he asked no individual questions of Brown, but said he asked no individual questions if someone had not responded to a general question first. He also stated that Carranza had a family friend who had been charged with an offense, and Brown made no comments during voir dire. He testified that he struck the third person (Higgins, number 16), a longshoreman, based on his occupation because of generalizations based on his work environment. The prosecutor denied that race was one of the factors on which he based his challenges.

The State introduced into evidence the prosecutor's notes on members of the venire (State's exhibit number one). The notes show five individuals marked as "overweight." As noted above, the State struck two minority members of the venire because they were overweight. Defense counsel noted that a third member of the venire marked "overweight" by the State was not struck. The prosecutor responded that the prospective juror did not believe alcoholism was a disease, and that he thought she would be a good juror because he expected a possible temporary insanity defense based on intoxication. A fourth individual marked "overweight" (Carr, number 27) was not struck by the prosecutor, but was struck by the defense. The prosecutor noted that her husband worked for the police department. The fifth individual was venire person number 37 and was not struck by either the State or the defense because he was not reached.

To establish a prima facie case of purposeful discrimination by the State in the selection of a jury, it has been held that a defendant must show that: (1) he is a member of a cognizable racial group; (2) the prosecutor exercised peremptory challenges to remove from the venire members of the defendant's race; and (3) these facts and any other relevant circumstances raise an inference the prosecutor used the peremptory challenges to exclude the venire members on account of their race. *Sala-*

*zar v. State,* 795 S.W.2d 187, 193 (Tex. Crim.App.1990); *Tompkins v. State,* 774 S.W.2d 195, 200 (Tex.Crim.App.1987) (quoting *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722), *aff'd,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989). We note that the initial burden in establishing a prima facie case of discrimination is not onerous. *Salazar,* 795 S.W.2d at 193 n. 13; *see also Hill v. State,* 827 S.W.2d 860, 867 (Tex. Crim.App.1992) (policy of the court is not to review the issue of a prima facie case where prosecutor has articulated reasons for challenged strikes). The proper focus is on the number of minority venire persons actually struck. *Dewberry v. State,* 776 S.W.2d 589, 591 (Tex.Crim.App.1989). Because the prosecutor used peremptory challenges to strike all but one minority member of the venire and provided reasons for his strikes, we conclude a prima facie case of discrimination was established. Therefore, we consider whether the State's neutral explanations for striking the minority venire persons were pretextual. *Keeton v. State,* 749 S.W.2d 861, 868 (Tex. Crim.App.1988); *Jones v. State,* 781 S.W.2d 415, 416 (Tex.App.—Houston [1st Dist.] 1989, pet. ref'd).

The trial court made no findings, but merely denied the appellant's *Batson* motion after hearing the prosecutor's testimony and admitting State's exhibit number one into evidence. We review whether the action of the court was "clearly erroneous." *Hill,* 827 S.W.2d at 866; *Williams v. State,* 804 S.W.2d 95, 101 (Tex.Crim.App. 1991), *cert. denied,* — U.S. —, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991).

▮▮ Once the prosecutor denies any racial motive, and provides clear, reasonably specific, neutral explanations for his strikes, the trial judge becomes the factfinder and must gauge the credibility of his testimony. *Tompkins,* 774 S.W.2d at 202 n. 6; *Jones,* 781 S.W.2d at 417. The defendant bears the burden of persuading the trial judge that the allegations of purposeful discrimination are true by a preponderance of the evidence. *Tompkins,* 774 S.W.2d at 202; *Jones,* 781 S.W.2d at 417. Here, the appellant offered no argument or

proof to show that the striking of the longshoreman venire member was a pretext. However, the appellant did show that the State failed to strike an "overweight" white member of the venire, while striking two "overweight" minority members. The State countered that the reason for the distinction was the white member's opposition to alcoholism as a disease. Based on the testimony giving clear, reasonably specific, and race-neutral explanations for the State's exercise of peremptory challenges, and the fact that one minority member served on the jury, we cannot conclude the action of the trial court denying the appellant's *Batson* motion was clearly erroneous.

We overrule the appellant's second point of error.

In his third point of error, the appellant asserts the trial court erred by including in the charge punishment instructions on good conduct time and parole.

The trial court's charge on punishment contained the following instruction pertaining to good conduct and parole law:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner. It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-fourth of the sentence imposed or 15 years, whichever is less, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than six (6) years he must serve at least two (2)

years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

This wording is identical to that Tex.Code Crim.P.Ann. art. 37.07, sec. 4(a) (Vernon Supp.1992) requires the trial court to give the jury in the punishment phase of a felony trial.

At trial, the appellant objected to this part of the charge as violating U.S. Const. amends. V and XIV and Tex. Const. art. I, sec. 19. The appellant does not renew, or brief, his constitutional objection, but states that article 37.07, section 4(a) was challenged in *Oakley v. State*, 807 S.W.2d 378 (Tex.App.—Houston [14th Dist.] 1991) and that the Court of Criminal Appeals has granted the petition for discretionary review.

As the appellant acknowledges, the predecessor statute of article 37.07, section 4(a)[1] was declared unconstitutional by the Court of Criminal Appeals in *Rose v. State*, 752 S.W.2d 529, 534 (Tex.Crim.App.1987). Thereafter, on May 2, 1989,[2] the legislature adopted a joint resolution amending the Texas Constitution to authorize itself to adopt laws requiring or permitting courts to inform juries about the effect of good conduct time and eligibility for parole. The legislature then reenacted article 37.07,

section 4(a),[3] contingent upon voter approval of the joint resolution. The resolution was approved on November 7, 1989. Tex. Const. art. IV, sec. 11.

In *Oakley*, the Fourteenth Court of Appeals upheld the constitutionality of reenacted article 37.07, section 4(a) on state grounds because of Tex. Const. art. IV, sec. 11. 807 S.W.2d at 381. The court upheld its constitutionality on federal grounds because the Supreme Court, in *California v. Ramos*, 463 U.S. 992, 1010, 103 S.Ct. 3446, 3458, 77 L.Ed.2d 1171 (1983), had held that a jury's consideration of the governor's power to commute a life sentence was not prohibited by the federal constitution. The Court of Criminal Appeals affirmed *Oakley* on state constitutional grounds.[4]

The Court of Criminal Appeals did not address the federal constitutional grounds, which were not raised in the petition for discretionary review. Nor do we because they have not been briefed by the appellant.

We overrule the appellant's third point of error.

■ In his fourth point of error, the appellant contends the trial court erred when it failed to grant a directed verdict of "not true" to enhancement paragraphs four through twelve of the indictment, because none of the pen packets admitted into evidence showed the date of the offense.

Section 12.42 of the Penal Code provides: If it be shown on the trial of any felony offense that the defendant has previously been finally convicted of two felony offenses, and the *second previous felony conviction* is for an *offense that occurred subsequent to the first previous conviction having become final,* on conviction he shall be punished by confinement in the Texas Department of Correc-

---

1.  Act of June 13, 1985, 69th Leg., R.S., ch. 576, sec. 1, 1985 Tex.Gen.Laws 2195, *amended by* Act of May 6, 1987, 70th Leg., R.S., ch. 66, sec. 1, 1987 Tex.Gen.Laws 170, *amended by* Act of June 19, 1987, 70th Leg., R.S., ch. 1101, sec. 15, 1987 Tex.Gen.Laws 3750, 3765.

2.  Tex. S.J. Res. 4, 71st Leg., R.S., 1989 Tex.Gen. Laws 6414.

3.  Act of May 17, 1989, 71st Leg., R.S., ch. 103, sec. 1, 1989 Tex.Gen.Laws 442.

4.  *Oakley v. State*, 830 S.W.2d 107 (Tex.Crim. App.1992).

tions for life, or for any term of not more than 99 years or less than 25 years. TEX. PENAL CODE ANN. § 12.42(d) (Vernon Supp.1992) (emphasis added). *See Ex parte Klasing*, 738 S.W.2d 648, 649 (Tex. Crim.App.1987); *Casey v. State*, 708 S.W.2d 914, 916 (Tex.App.—Houston [1st Dist.] 1986, pet. ref'd).

The indictment contained 16 enhancement paragraphs. After the pen packets relating to the enhancement paragraphs were introduced into evidence, the appellant moved for a directed verdict because there was no evidence of the date of the offense in enhancement paragraphs four through twelve. The court denied the motion, commenting that the matter would be reexamined before the charge was submitted to the jury. The court's charge on punishment contained the following limitation:

> If you believe from the evidence beyond a reasonable doubt, that the Defendant was convicted of at least *one of the felony offenses alleged in enhancement paragraphs Twelve, Thirteen, Fourteen or Sixteen,* and that the Defendant was convicted of at least one other final felony conviction in which the commission of the *second offense occurred subsequent to the previous final felony conviction as alleged in enhancement paragraphs Twelve, Thirteen, Fourteen or Sixteen* of the indictment, then you shall assess the punishment of the defendant, JOHNNY RAYMOND POWELL, at confinement in the penitentiary for any term of years not less than twenty-five (25) or more than ninety-nine (99) or life.

The jury verdict found that the appellant "had been convicted of at least two of the felony offenses as alleged in enhancement paragraphs Twelve, Thirteen, Fourteen or Sixteen of the indictment with the Defendant being convicted of a felony offense that the defendant committed subsequently to a previous final felony conviction...."

The State offered into evidence State's exhibits 17, 18, 19, and 20 over the appellant's objections. Exhibit 17 (enhancement paragraph 12) was the pen packet relating to the appellant's conviction for robbery by

assault in cause number 92664; exhibit 18 (enhancement paragraph 13) was the pen packet relating to the appellant's conviction for unlawful possession of heroin in cause number 175861; exhibit 19 (enhancement paragraph 14) was the pen packet relating to the appellant's conviction for burglary in cause number 283056; and exhibit 20 (enhancement paragraph 16) was the pen packet relating to the appellant's conviction for robbery by threats in cause number 84CR0501W. The exhibits were admitted. Exhibit 17 showed a judgment date of October 25, 1960, but no offense date. Exhibit 18 showed an offense date of February 14, 1972, and a judgment date of August 15, 1972. Exhibit 19 showed an offense date of July 15, 1978, and a judgment date of November 16, 1978. Exhibit 20 showed an offense date of January 22, 1984, and a judgment date of February 24, 1984.

By limiting the jury's consideration to enhancement paragraphs 12, 13, 14, and 16, the trial court in essence granted the relief the appellant sought through his motion for a directed verdict. While the pen packet relating to enhancement paragraph 12 did not contain an offense date, one would not be required because this was the first felony conviction for purposes of section 12.42(d). The pen packets for the other "second offenses" contained both offense and judgment dates showing they occurred after the first conviction.

We overrule the appellant's fourth point of error.

The judgment is affirmed.

O'CONNOR, J., dissents.

O'CONNOR, Justice, dissenting.

I dissent.

In point of error two, the appellant contends that the trial court erred when it failed to quash the jury panel because the State peremptorily struck two black and one Hispanic members of the venire in violation of U.S. CONST. amends. V and XIV, TEX. CONST. art. I, sec. 19, and TEX.CODE CRIM.P.ANN. art. 35.261 (Vernon 1989). *Powers v. Ohio,* — U.S. —, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Batson v.*

*Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *State v. Oliver,* 808 S.W.2d 492 (Tex.Crim.App.1991).

Because the State's overall conduct in jury selection is relevant in proving discrimination, we must review the voir dire for each minority juror who was struck by the State and the State's explanation for each. *Whitsey v. State,* 796 S.W.2d 707, 727 (Tex.Crim.App.1989). When we review the prosecutor's explanation, we cannot merely accept the reasons given by the prosecutor at face value. *Keeton v. State,* 749 S.W.2d 861, 869–70 (Tex.Crim.App. 1988). We must consider whether the facially-neutral explanations are contrived to avoid admitting discrimination. *Id.* at 868. *Keeton* identified two factors that weigh heavily against the legitimacy of a racially-neutral explanation: no examination or only a perfunctory examination of the juror, and a reason given for the challenge that is unrelated to the facts of the case. *Id.* at 866.

The appellant is white. Three of the four minority members of the venire were struck by the State. One Hispanic served on the jury. The trial court took judicial notice that 43 out of the 47 members of the venire were white. The prosecutor did not ask any of the three persons he struck any specific questions.

At the Batson hearing, the defense counsel called the prosecutor to testify. When asked to explain his strikes, the prosecutor referred to his notes, which were later introduced as an exhibit. Here is a summary of the information about the three prospective jurors, the prosecutor's reasons for striking them, and the reasons I would hold that the strikes were not race-neutral.

### Brown, Number 3

Mr. Brown is an African–American male who is overweight. The prosecutor said he struck Mr. Brown because he was overweight and because he did not say anything during voir dire. The prosecutor explained his bias against overweight people:

> I believe overweight individuals are people who for the most part have been—feel themselves to be victimized and to some extent can see themselves in the position of being accused like a defendant in a criminal case and I don't want anybody who—who can be sympathetic.

> And I must reiterate, this is not a primary method of jury selection but after I have selected out—or struck out the main people for various reasons, then I come down to having to use generalizations in order to make my strikes. Race is not one of those generalizations.

The prosecutor's notes show that he marked five members of the venire as "overweight." Defense counsel pointed out that the prosecutor did not strike two white members of the venire that were marked "overweight."[1] The prosecutor explained that he did not strike the white juror number 12, who was overweight, because she said she did not believe alcoholism was a disease, and the prosecutor expected the appellant to assert a temporary insanity defense based on intoxication. The prosecutor did not explain why he did not strike another white and overweight juror, number 37.

In *Hill v. State,* 787 S.W.2d 74, 78–79 (Tex.App.—Dallas 1990), *aff'd,* 827 S.W.2d 860 (Tex.Crim.App.1992), the prosecutor said he struck a juror because the prosecutor thought the juror would identify with the defendant and he did not like the way the juror responded to questions. The only questions the prosecutor had asked the juror were where he worked and if he could be fair. The Dallas Court of Appeals held that the reasons given by the prosecutor for challenging the juror were based on assumptions of the prosecutor and were unrelated to evidence in the case. Thus, the court concluded the reason for the strike could not be considered race-neutral. *Id.; see also Reich–Bacot v. State,* 789 S.W.2d 401, 403 (Tex.App.—Dallas 1990) (the prosecutor's explanation that the juror worked with people involved with criminal activities, when juror actually said she worked with people with disabilities, was

---

1. One of the individuals marked as "overweight" by the State was struck by the defense.

not supported by the evidence and thus was not a race-neutral explanation), *pet. dism'd per curiam*, 815 S.W.2d 582 (Tex. Crim.App.1991); *Chivers v. State*, 796 S.W.2d 539, 542 (Tex.App.—Dallas 1990, pet. ref'd) (the prosecutor's unverified assumption that a juror who worked for DART did not indicate a sufficient level of intelligence, was not a race-neutral explanation); *Lewis v. State*, 779 S.W.2d 449, 455 (Tex.App.—Tyler 1989, pet. ref'd) (lack of meaningful examination of an African-American juror who said she knew one of the State's witnesses from another case, did not rebut presumption of racial discrimination).

If a prosecutor makes an assumption about a juror, but does not question the juror to verify the assumption, it is some indication the strike was not race-neutral. *Woods v. State*, 801 S.W.2d 932, 936–37 (Tex.App.—Austin 1990, pet. ref'd) (the prosecutor said he struck the juror because he had a punk rock haircut that he associated with liberals, radicals, and the drug culture, but did not question juror to verify his assumption).

I would hold that, absent any questions to Mr. Brown to verify the prosecutor's prejudice against overweight jurors, the State failed to prove the strike was race-neutral.

### Higgins, Number 16

Mr. Higgins is an African–American male, with a slender build. The prosecutor said he struck Mr. Higgins because he was a longshoreman.

The prosecutor explained:

When they have certain professions such as a longshoreman, I use generalizations concerning their work environment. You have to form some basis on which to strike people who don't have obvious biases that cannot be picked out.

Again, because the prosecutor did not question Mr. Higgins to verify his assumptions, I would hold that the State failed to prove the strike was race-neutral.

### Mr. Carranza, Number 26

Mr. Carranza is a Hispanic male who is overweight. The prosecutor said he struck Mr. Carranza because he was overweight and he had a friend who had been charged with an offense. Thus, we must examine the record to determine if the two reasons were race-neutral.

The prosecutor asked the following questions of Mr. Carranza:

The State: Anybody on the second row know of anybody who has been charged with a serious offense?

. . . .

Mr. Carranza: Yes, I had a friend, a family friend, the young sister, he had been convicted or something of a armed robbery or something like that.

The State: Did you know him very well?

Mr. Carranza: Growing up I knew him, but I haven't seen him in five or ten years.

The State: Okay. Do you think he was treated fairly?

Mr. Carranza: From what I understand.

The State: Okay. Is there anything about that that would affect you in this case here?

Mr. Carranza: No.

There were two members of the venire who said they knew someone who was charged with a crime but who the prosecutor did not strike. Stefka, juror number 31, said he knew a man charged with capital murder. The prosecutor's individual questions to Mr. Stefka were as follows:

Mr. Stefka: I know of somebody that's been charged with attempted capital murder.

The State: Do you know the person very well?

Mr. Stefka: I know his dad real well. . . . It's Tim Matheson.

The State: Do you know him?

Mr. Stefka: He lived around the corner from me; and my opinion, I think he's been treated exceptionally well.

The State: Maybe even too well?

Mr. Stefka: Well, I can't say that; but I know he's been—you know, he hadn't—

shouldn't be any complaints about the way he's been treated.

The State: Is there anything about that that would affect your judgment here?

Mr. Stefka: No.

The other juror who knew someone involved in a crime and who the prosecutor did not strike was Ms. Lostak, juror number 45. She testified as follows:

The State: Who do you know?

Ms. Lostak: I know about the Mathesons.

The State: Do you know the person charged? Do you feel that he's been treated fairly?

Ms. Lostak: I know no knowledge of how he's been treated.

The State: Okay. Is there anything about that that—how closely do you know this individual?

Ms. Lostak: Socially, several years ago but nothing recent.

The State: Is there anything about that that would affect you in this case here?

Ms. Lostak: No.

I would hold that the State failed to prove the strike of Mr. Carranza was race-neutral. First, as to being overweight, the prosecutor did not question Mr. Carranza to verify his assumptions regarding overweight jurors. Second, as to knowing someone who had been charged with a crime, there was no discernible difference between the answers Mr. Carranza gave and those the other two jurors gave about knowing someone who had been charged with a crime.

I would sustain point of error two and reverse and remand for new trial.